BRADY, Justice
(dissenting).
With deference to my colleagues who adopt the majority opinion, I think that a liberal construction of the act does not mean a liberal construction of the facts in this case. The record discloses that ap-pellee heretofore has been paid compensation benefits in the amount of $16,632.86, and medical expenses in the amount of $1,-932.82. While there is only $431.36 involved in this immediate claim, it has attendant far reaching consequences. I think that the thrust of the appellant’s argument is well taken that the findings of the Commission, which were affirmed by the circuit court, are against the overwhelming weight of the evidence and that the evidence sup *882 -ports the contention that the claimant had .a basic congenital or inherited condition; -that he has now completely recovered from .a heart attack, and that the furnishing of the drugs, librium and lufa, does not fall •within “ * * ■ * such period as the nature ■of the injury or the process of recovery may •require.”
Dr. Alexander was asked this question by the attorney referee: “Would it be a fair •statement to state (that) these medicines ■you have prescribed, you would call them ■preventative medicines for another heart .attack?” The doctor answered: “No, it won’t prevent him from having another heart attack; the drug for excessive gas .and the tranquilizer could be used for anyone that has no heart trouble at all in an .attempt to help indigestion, dyspepsia, and •nervous tension and anxiety.” He was further asked: “This medication, would you say it would be the accepted and standard post-thrombotic episode medication for a person who has had a thrombotic episode?” The doctor replied: “The lufa. I think in all fairness to Mr. Bergin you have to keep his heart and his stomach separated, .and lufa is used in an attempt to keep his ■cholesterol blood level within sound limits, if possible, in the hopes that he wouldn’t form cholesterol plaques.” It is obvious ap-pellee’s employment had no connection ■whatsoever with his cholesterol problem.
Dr. Alexander was asked on cross-examination : “ * * * On the librum, is there .any connection between his heart condition .and taking tranquilizers ?” He replied : “Not directly. As I say, the only reason for the tranquilizer is to keep him relaxed and calm and not being over anxious. * * *» He stated that a condition of high cholesterol in the blood is a basic, instate, congenital metabolism defect which is hereditary, and that the heart attack did not .bring on this high cholesterol condition. Then he was asked the question: “All right, •then the medicine he is taking has nothing to do with the curing or the treatment of the previous heart attack he had?” He replied: “No. He is well from his first heart attack.”
Of course, the utmost sympathy is properly extended to those who are unfortunate in suffering physical injuries or handicaps, and the Court fully realizes that the livelihood of an employee depends to a large extent upon the physical condition of the employee, but the Court is not warranted thereby in affirming the Commission’s award of benefits that do not fall within the intent of the statute. See Crow v. Scoggins, 248 Miss. 1, 158 So.2d 1 (1963); Malone v. Ingalls Shipbuilding Corp., 240 Miss. 319, 127 So.2d 403 (1961); Rathborne, Hair & Ridgeway Box Co. v. Green, 237 Miss. 588, 115 So.2d 674 (1959).
The ultimate of this decision for employers is the establishment of an employee’s lifetime medicare program for all employees who have a heart atttack or similar incapacitating malady, from which they have recovered, and in which arteriosclerosis, high cholesterol or other hereditary or acquired metabolic symptoms play a significant contributing part. An objective study of the Act, together with the facts in this case, convinces me that such profound legislative intent is wholly lacking. It is solely for the legislature to effect that which it can easily do, if it so desires, by enacting this new medical program. Such is not a proper judicial function.
The ultimate of this far reaching decision, like a pyrrhic victory, insofar as the employees are concerned will be that no employer will dare to give employment to an employee who has detectable arteriosclerosis, a high cholesterol level, or other similar ailment or systemic condition for the reason that he could be required to furnish the employee medicine for the rest of his life.
In conclusion, I am of the opinion that the compensation act contemplates that when the injury received in the course of his employment ceased to superimpose itself on the preexisting condition, then the *883 liability for the medical payments should terminate.
For these reasons, I am persuaded to dissent.
GILLESPIE, P. J., and SMITH and ROBERTSON, JJ., join in this dissent.